NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO C.M.

No. 1 CA-JV 22-0225
FILED 5-4-2023

---

Appeal from the Superior Court in Maricopa County
No. JD39408
The Honorable Todd F. Lang, Judge

**AFFIRMED**

---

COUNSEL

Law Office of H. Clark Jones, LLC, Mesa
By H. Clark Jones
*Counsel for Appellant Mother*

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant Father*

Arizona Attorney General's Office, Phoenix
By Jennifer L. Thorson
*Counsel for Appellee*

_____

**MEMORANDUM DECISION**

Judge Daniel J. Kiley delivered the decision of the Court, in which Presiding Judge Maria Elena Cruz and Judge James B. Morse Jr. joined.

_____

**K I L E Y**, Judge:

¶1          Savannah N. ("Mother") and Robert M. ("Father") appeal the juvenile court's order terminating their parental rights to their child, C.M. Because reasonable evidence supports the termination order, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2          The Department of Child Safety ("DCS") removed C.M. from her parents' custody the day after she was born in May 2020. Five days later, DCS filed a dependency petition alleging that C.M.'s parents were "unable or unwilling to provide proper and effective parental care and control" due to their homelessness, Mother's marijuana use during pregnancy, Father's reported methamphetamine use, and the parents' "admitted . . . history of domestic violence."

¶3          Mother regained physical custody of C.M. in September 2020, conditioned on the presence of a live-in safety monitor in her home. C.M.'s return to Mother's care was short-lived. After only ten days, DCS successfully moved to again take custody of C.M. following an incident in which Mother began screaming and cursing in frustration over C.M.'s persistent crying. After Mother angrily rebuffed the safety monitor's attempts to step in to try to soothe C.M., police intervention was required to restore calm to the home. After this incident, Mother admitted to a DCS child safety specialist that she "felt very overwhelmed" and "triggered" by C.M.'s crying.

¶4          In November 2020, the court granted the dependency petition as to both parents.

¶5          DCS offered the parents many services to facilitate their reunification with C.M., including parent aide services, psychological evaluations, substance abuse treatment, domestic violence treatment, psychiatric evaluations, supervised visitations, and individual counseling.

¶6          Mother and Father were inconsistent in their participation in these services. Both parents successfully completed a one-on-one parenting program. Mother successfully completed substance abuse treatment, consistently tested negative for all substances, and completed several sessions of individual counseling with a doctoral-level therapist. Neither parent, however, engaged in domestic violence counseling or treatment.[1] Although the parents engaged in supervised visits with C.M., they both frequently arrived unprepared and late, often by 30 minutes or more, to scheduled visits. And the parents' parent aide services were "closed unsuccessfully" due to "lack of consistent engagement."

¶7          In October 2020, Mother completed a psychological evaluation with Dr. Jeremiah D. Isbell. In connection with the evaluation, Dr. Isbell interviewed Mother (who described an unstable childhood characterized by domestic violence between her parents and sexual abuse at the hands of her stepbrother) and administered psychological tests. After completing his evaluation, Dr. Isbell diagnosed Mother with post-traumatic stress disorder ("PTSD"), unspecified personality disorder with mixed traits (dependent, borderline, and antisocial), cannabis use disorder, stimulant use disorder, unspecified alcohol related disorder, and borderline intellectual functioning with an IQ of 75. After noting that Mother accepted no responsibility for the removal of C.M. from her care for the second time in September 2020, claiming instead that the child was removed because "my safety monitor flipped out," Dr. Isbell found that Mother "appears to have limited awareness and insight into her dysfunctional attitudes and behaviors." Dr. Isbell opined that Mother's "maladaptive personality traits" appear to have given rise to "a pervasive and excessive need to be taken care of by others," an issue of particular concern since "she does not have a healthy support system." These factors, Dr. Isbell determined, "significantly negatively impact[]" Mother's "ability to meet the complex needs of her very young child." Because of Mother's "untreated PTSD," her "underlying maladaptive personality traits," and "the dysfunctional thinking and behaviors she has developed over the years," Dr. Isbell concluded that the prognosis for Mother's ability to parent C.M. safely in the foreseeable future was "guarded." Finding Mother "in dire need of individual counseling addressing her PTSD and maladaptive personality pathology," Dr. Isbell recommended that she receive individual counseling

---

[1] After Mother reported enrolling in domestic violence counseling with Terros, DCS contacted Terros and learned that Mother had not, in fact, enrolled. Ultimately, Terros "close[d] out service" due to Mother's "fail[ure] to attend."

"from a DBT[2] orientation . . . at minimum[,] once per week" for "at least 12 months."

¶8            A DCS Progress Report dated July 16, 2021 reflects that, despite Dr. Isbell's determination that Mother "was 'in dire need' of DBT therapy" and DCS's offer to help Mother enroll in the recommended therapy, she still had "not enrolled in the service" nine months later.

¶9            In October 2021, DCS moved to terminate Mother's and Father's parental rights on the grounds of mental illness/deficiency, *see* A.R.S. § 8-533(B)(3), and C.M.'s out-of-home placement for fifteen months or longer, *see* A.R.S. § 8-533(B)(8)(c).

¶10           Over a year after Dr. Isbell's psychological evaluation, Mother completed a second evaluation, this time with Dr. James S. Thal. Mother again described a childhood marked by physical and sexual abuse. She insisted, however, that she was "untroubled by the sexual abuse she endured as a child." She denied the validity of the concerns that led DCS to remove C.M., blaming her aunt, in whose care C.M. had been placed, for "lying" to DCS. According to Mother, "her aunt contacted DCS" to make false accusations against her because her aunt wanted a girl "and could not have any more children of her own."

¶11           Like Dr. Isbell, Dr. Thal diagnosed Mother with PTSD, unspecified personality disorder (noting borderline traits), stimulant use disorder, and an unspecified intellectual disability. Dr. Thal opined that Mother's "unstable moods, emotions, behaviors, and past drug use have rendered her incapable of safely and effectively parenting a child." Dr. Thal's prognosis for Mother's ability to parent C.M. safely in the foreseeable future was "marginal." Dr. Thal recommended that Mother receive "[a]pproximately 20 sessions [of] individual therapy" to "address her PTSD symptoms, maladaptive behaviors, and deficient coping skills," adding that "[i]t may be helpful for [Mother] to have weekly or every other week sessions with a doctoral level clinician."

¶12           In February 2022, Mother began to engage in the recommended therapy with a doctoral-level therapist. Mother attended

---

[2] Dr. Isbell explained that dialectical behavior therapy, or DBT, is a form of therapy that addresses "trauma-related symptoms" and aims to "help[] the client achieve better emotional stability to challenge some of their attitudes that may be . . . irrational or dysfunctional."

only four therapy sessions, however, before she stopped attending in mid-March 2022.

¶13        After initially refusing DCS's request that he participate in a psychological evaluation, Father completed such an evaluation with Dr. Stephanie Leonard in February 2021. During his interview, Father reported that "he was mentally, emotionally, and physically abused" as a child and that he "moved out of his parents' home" when he was eleven years old, thereafter living "off and on" with his grandparents. Like Mother, Father reported no healthy support system, identifying his "current social support" as "[m]yself." His scores on psychological tests were consistent with those of people who are "distrustful" and "self-centered," and who "tend to be uninsightful."

¶14        Dr. Leonard diagnosed Father with a personality disorder and attention-deficit/hyperactivity disorder ("ADHD"), opining that his "symptoms can impact his ability to adequately parent a child." The doctor noted Father is "self-preoccupied" and exhibits the "strong need for attention and affection" that is characteristic of "self-centered" parents who "often place" their own needs "above the needs of their children." Dr. Leonard also observed that Father has a "paranoid predisposition" which "keeps him rigid and inflexible to meet the needs of his child and learn new information that can help him increase his parenting skills." She recommended that Father engage in individual therapy with a doctoral-level counselor and suggested that Father may benefit from counseling on "the cycle of abuse" and "how domestic violence affects children." Dr. Leonard warned that "[t]he prognosis that [Father] can provide minimally adequate parenting skills in the foreseeable future is dependent on [the] success of proposed interventions," noting that "successful results may take several months." If Father "engage[d] in therapy consistently," however, Dr. Leonard opined that the prognosis for his ability to parent a child effectively "may increase" from "poor" to "adequate."

¶15        The record indicates that by the end of 2021, Father enrolled in individual counseling, but not with a doctoral-level therapist, and had only completed "approximately 4 sessions." His therapist indicated they had not addressed themes of domestic violence and Father had failed to provide documentation showing he had engaged in other domestic violence treatment. By March 2022, DCS records indicated that Father no longer had "an open chart" with the service that provided him individual therapy.

¶16    DCS's motion to terminate Mother's and Father's parental rights proceeded to a six-day trial in 2022.

¶17    Dr. Isbell testified at trial that Mother's "turbulent background" and "ongoing trauma symptomology" necessitate "meaningful treatment" before she could "parent in a healthy manner." He further testified that Mother had not yet engaged in sufficient therapy to warrant changing his prognosis of her future parenting ability as "guarded."

¶18    Dr. Thal similarly testified that Mother's "unstable moods, emotions, [and] impulsive behavior" would impair her "ability to safety and competently care for a child," describing "[h]er ability to meet a minimally adequate [parenting] standard" as "very uncertain." Dr. Thal explained that after completing his evaluation, he considered Mother's prognosis "pretty bleak unless she could turn things around." The information available to him, he went on, indicated that Mother has not been "consistently involved in services" to the extent necessary to warrant modifying Mother's unfavorable prognosis.

¶19    Rob Petsche, a licensed professional counselor, testified that he began counseling Mother in November 2021 and was still treating her at the time of trial. Mr. Petsche expressed a positive view of Mother's progress and ability to parent, asserting that her confidence, assertiveness, responsibility, and ability to take ownership of her actions had improved. Mr. Petsche testified that he believed Mother had developed adequate coping skills to parent C.M. effectively, that he did not believe Mother's mental health would bar her from parenting C.M., and that he believed Mother could complete DCS's services if given more time to do so.

¶20    In their testimony at trial, both parents acknowledged that they did not consistently engage in services that DCS offered. Mother, for example, admitted that she did not successfully complete parent aide services, while Father admitted that he was closed out of counseling services for lack of engagement.

¶21    After the trial, the juvenile court determined that the State had proven grounds for termination under A.R.S. §§ 8-533(B)(3) (mental illness/deficiency) and -533(B)(8)(c) (fifteen months' out-of-home placement). As to the former, the court found that neither parent had engaged in services offered by DCS to the extent necessary to address their "significant cognitive impairments and serious and significant mental health issues." The court further found that termination would be in C.M.'s

best interests, and so terminated the parental rights of both Mother and Father. Both parents appeal. We have jurisdiction. *See* A.R.S. §§ 8-235(A), 12-120.21(A), -2101(A)(1).

## DISCUSSION

**¶22** Parents' right to the custody and control of their children, while fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). Termination of parental rights may be warranted where the moving party proves, by clear and convincing evidence, one of the statutory grounds set forth in A.R.S. § 8-533(B). *Id.* at 249, ¶ 12. Evidence is "clear and convincing" if it is "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284-85, ¶ 25 (2005) (citation omitted).

**¶23** "We review an order terminating a parent's relationship with his or her child . . . in the light most favorable to sustaining the superior court's ruling." *Calvin B. v. Brittany B.*, 232 Ariz. 292, 296, ¶ 17 (App. 2013). We "will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). This Court does not reweigh the evidence on review but "look[s] only to determine if there is evidence to sustain the court's ruling." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

**¶24** The juvenile court may find grounds for termination of a parent-child relationship if there is clear and convincing evidence that "the parent is unable to discharge parental responsibilities because of mental illness [or] mental deficiency" and "there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period." A.R.S. § 8-533(B)(3).

**¶25** Mother does not dispute the juvenile court's findings about the severity of her mental health issues and the negative impact those issues have on her ability to safely parent a child. She nonetheless contends that no reasonable evidence supports the court's "forward-looking finding" that her condition would continue for a prolonged, indeterminate period.

**¶26** Reasonable evidence supports the juvenile court's conclusion that DCS proved by clear and convincing evidence that Mother's mental infirmities would continue for a prolonged, indeterminate period. Both psychologists, who independently evaluated Mother a year apart, expressed significant concerns about Mother's ability to parent. Each gave

an unfavorable prognosis for Mother's ability to parent C.M. safely in the foreseeable future. Both psychologists recommended Mother engage in individual therapy. As the court found, Mother did not begin the recommended doctoral-level counseling until February 2022 and attended only four sessions before she stopped attending the following month. At the time of trial, Mother had not attended a counseling session in over two months. Both Dr. Isbell and Dr. Thal testified that they did not believe Mother had engaged in enough therapy to address her mental infirmities. A reasonable factfinder could conclude from this testimony that Mother's impaired ability to safely parent would continue for a prolonged and indeterminate period.

¶27        Mother argues that the juvenile court gave too much weight to the testimony of Dr. Isbell and Dr. Thal and not enough to Mr. Petsche's. Noting that the psychologists "only met with [her] once and had no ongoing treating relationship with her," Mother insists that their testimony could not "constitute a reasonable basis for the required clear and convincing findings." This is especially so, Mother argues, when contrasting the psychologists' testimony with Mr. Petsche's "boots-on-the-ground perspective and testimony that Mother had progressed sufficiently to adequately parent, and her real-life success in overcoming substance abuse and housing/employment instability."

¶28        This Court will not reweigh the evidence or redetermine the credibility of witnesses, *see Mary Lou C.*, 207 Ariz. at 47, ¶ 8, "even when sharply disputed facts exist," *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151, ¶ 18 (2018) (cleaned up). Here, the juvenile court expressly found the testimony of Dr. Isbell and Dr. Thal more persuasive than that of Mr. Petsche, and we will not disturb that finding.

¶29        Referring to Dr. Thal's statement at trial that "[h]er ability to meet a minimally adequate [parenting] standard . . . is very uncertain," Mother contends that Dr. Thal's testimony was too equivocal to constitute clear and convincing evidence. On the contrary, she asserts, Dr. Thal's characterization of her ability to parent in the future as "very uncertain" establishes "that even Dr. Thal wasn't *convinced*" Mother could not meet her parental duties in the near future.

¶30        A reasonable factfinder could interpret Dr. Thal's description of Mother's ability to parent at a minimally adequate level as "very uncertain" to mean it was unlikely she would be able to do so. Moreover, Dr. Thal also testified that "unless [Mother] made major headway, the probability was she was not going to be able to parent her child competently

safely, adequately within the statutory time limits" and that "it doesn't sound like those things have happened or improved." Dr. Isbell similarly determined that Mother is "incapable of safely and effectively parenting a child" due to her unstable moods, emotions, and behaviors, and that her "marginal" prognosis was unlikely to improve in light of her past inability to "establish[] and maintain[] emotional stability." Viewed as a whole, a reasonable factfinder could conclude from this evidence that DCS had met its burden of showing, by clear and convincing evidence, that reasonable grounds exist to believe Mother's condition would continue for a prolonged, indeterminate period. *See Kent K.*, 210 Ariz. at 284-85, ¶ 25.

**¶31**        The evidence in the record is more than sufficient to support the juvenile court's conclusion that DCS met its evidentiary burden to establish grounds for termination of Mother's parental rights under A.R.S. § 8-533(B)(3).

**¶32**        Noting that his parental rights were terminated on grounds different from the suspected drug use alleged in the initial dependency petition, Father complains that DCS unfairly "mov[ed] the goal posts . . . midway through [the] case."

**¶33**        Father's suggestion that DCS cannot allege grounds for termination other than those alleged in the initial petition finds support in neither logic nor the law. During the course of a dependency case, DCS may (and often does) learn of additional grounds for termination that were not apparent, and may not have even existed, at the outset of the dependency case. *See Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 355 (App. 1994) (rejecting parent's contention that superior court "violated her due process rights by terminating her parental rights based on a ground that did not exist when the petition was filed"). To hold that termination cannot be based on grounds different from those alleged at the outset would, in effect, impermissibly require DCS and the court to ignore relevant evidence simply because it did not come to light until after the dependency began. *See Alma S.*, 245 Ariz. at 148, ¶ 1 (holding that "courts must consider the totality of the circumstances existing at the time of the severance determination").

**¶34**        "[T]he ultimate focus of [appellate] inquiry" in termination cases is "on the fundamental fairness of the proceeding whose result is being challenged." *John M. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 320, 324, ¶ 14 (App. 2007) (cleaned up). When a new ground for termination is alleged during the pendency of a dependency case, fundamental fairness will be found as long as the parent is given "adequate notice" of, and "an

opportunity to defend against," the new allegations. *JS-501904*, 180 Ariz. at 355. Here, DCS alleged A.R.S. § 8-533(B)(3) as a ground for termination over six months before the termination hearing. Father had ample opportunity to prepare to defend against this ground, and he does not contend otherwise. We reject Father's suggestion that the juvenile court violated his due process right to fundamental fairness by terminating his parental rights on grounds not alleged in the initial dependency petition.

¶35        Father also argues that the juvenile court lacked reasonable evidence to terminate his parental rights on grounds of mental illness/deficiency. He does not dispute the court's findings that DCS "offered [Father] a variety of services" to "help address, directly or indirectly, the issues that led to" C.M.'s removal, and that Father "failed to engage in services in a meaningful or extended period." Father nonetheless argues that, though he "may not have participated in all services DCS requested of him," "he clearly . . . made progress in developing parenting skills."

¶36        Whatever progress Father may have made in developing his parenting skills does not, by itself, preclude termination on the mental illness/deficiency ground. In her evaluation, Dr. Leonard explained that Father's prognosis to be able to safely parent C.M. "is dependent on [the] success of the proposed interventions," and that "successful results may take several months." Dr. Leonard recommended that Father engage consistently in therapy at a doctoral level, attend domestic violence groups, and receive psychiatric services. At trial, Dr. Leonard testified that if Father failed to participate in these services, Father's prognosis for being able to parent C.M. safely in the near future "would be poor."

¶37        Father engaged in counseling, but not with a doctoral-level therapist, and only completed "approximately 4 sessions." Father never engaged in any recommended domestic violence counseling or treatment and never submitted proof of completion of a psychiatric evaluation to DCS. A reasonable factfinder could conclude that Father's failure to engage meaningfully in Dr. Leonard's recommended services made it highly probable that his mental infirmities would continue for a prolonged, indeterminate period. *See Kent K.*, 210 Ariz. at 284-85, ¶ 25.

¶38        Father next challenges the juvenile court's finding that DCS "made the necessary diligent efforts required by law." "[T]he State, in mental-illness-based severances, . . . [must] demonstrate that it has made a reasonable effort to preserve the family." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 33 (App. 1999). DCS need not provide "every

conceivable service," but it "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Id.* at 192, ¶ 37 (citation omitted).

**¶39** Father does not dispute that DCS provided him with, or otherwise referred him to, parent aide services, a psychological evaluation, domestic violence treatment, a psychiatric evaluation, supervised visits, and individual counseling. He complains, however, that DCS made "no 'concerted effort' to help with housing needs." Noting that the DCS case manager testified at trial that housing was a "significant barrier to reunification" with C.M., Father contends that DCS failed to provide adequate "assistance and support" to "alleviate[] the housing concern," specifically citing a $1,800 housing stipend that DCS could have pursued for him.

**¶40** Father was assigned a parent social worker who "assist[ed] him with obtaining housing." The case manager testified at trial that she recommended services Father could reach out to for housing assistance, and even offered to make calls on his behalf, but Father declined her offer of help. From this evidence, a reasonable factfinder could conclude that DCS proved, by clear and convincing evidence, that it made reasonable efforts to provide housing assistance to help preserve the family. *See Mary Ellen C.*, 193 Ariz. at 192, ¶ 33.

**¶41** Because clear and convincing evidence supports the termination of both Mother's and Father's parental rights under the A.R.S. § 8-533(B)(3) mental illness/deficiency ground, we need not evaluate whether reasonable evidence supported the court's determination that DCS also established grounds for termination under A.R.S. § 8-533(B)(8)(c). *See Jesus M.*, 203 Ariz. at 280, ¶ 3 (App. 2002) ("If clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds.").

**¶42** To terminate a parent's rights, the court must not only find a statutory ground for termination, but it must also determine that termination is in a child's best interests. A.R.S. § 8-533(B); *Michael J.*, 196 Ariz. at 249, ¶ 12. Here, the court found that termination is in C.M.'s best interests because she is currently "thriving" in the "loving and nurturing home environment" of a kinship placement with a maternal relative who wants to adopt her, thereby providing her with permanency and stability. The court also found that denying termination "would be detrimental" to C.M. because Mother and Father "have failed to adequately address their

extensive mental health issues and cognitive limitations." Neither party challenges the court's "best interests" determination on appeal. We therefore accept it and need not address it further.

## CONCLUSION

**¶43**        We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA